**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MEGAN ANGERS, JAMEY ARNOLD, ADRIANA ANTUNEZ, CAROLINE SCOTT, CHARLOTTE VAIL, MICHELLE ZACARIAS, | ) ) ) ) ) | Case No. 1:23-cv-02242 |
| | ) | Judge Jeffrey I. Cummings |
| Plaintiffs, | ) ) | Magistrate Judge Jeffrey T. Gilbert |
| v. | ) ) | |
| | ) | JURY DEMAND |
| CHICAGO POLICE OFFICERS JESSE CHAVEZ (#14182), MARK STYCZYNSKI (#5442), KYLE GLEESON (#3809), DAVID STEPNEY (#3141), MANE MARAVIC (#18441), DILLAN HALLEY (#7341), ARTHUR YOUNG (#1289), KEVIN GRAVES (16260), WILLIAM MURPHY (#19214), WILLIAM SCHIELD (#946), CHARLES RHEIN (#2164), ALEXANDER GONZALEZ (#4877), JAMES JOHNSON (#2293), JOSE ROJAS (#932), BRIAN GRIFFITH (#8236), THOMAS OSHAUGNESSY (#1247), ANDREA RODRIGUEZ (#18618), JONATHAN HERNANDEZ (#13181), LUIS LAURENZANA (#19637), SUPERINTENDENT DAVID BROWN, and CITY OF CHICAGO, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

**AMENDED COMPLAINT**

1.      During the summer of 2020, the United States was in the throes of the largest

social justice movement in history.  In a repudiation of anti-Black racism, white supremacy,

police violence, and mass criminalization and incarceration, millions joined demonstrations

around the globe—often lifting up the names of George Floyd, Breonna Taylor, Tony McDade,

Jacob Blake, and too many other Black people killed by police.

2.      Plaintiffs, as well as thousands of other organizers, activists, and community leaders in Chicago—multi-racial and intergenerational in composition—engaged in a wide range of actions throughout the summer of 2020, including rallies, marches, and other creative protests that consistently opposed racist police violence and demanded substantial changes, including the massive reduction of taxpayer money being used to fund the Chicago Police Department ("CPD").

3.      The CPD and other City agencies responded to these demonstrations with brutal, violent, and unconstitutional tactics that are clearly intended to injure, silence, and intimidate Plaintiffs and other protesters.  These abuse tactics include beating protesters with batons—often striking them in the head; tackling and beating protesters while on the ground; using chemical agents against protesters; falsely arresting protesters; and trapping protesters in enclosed areas.

4.      CPD consistently targeted protest leaders, marshals, legal observers, medics, and individuals recording the demonstrations with unlawful, retaliatory, and lethal force.

5.      CPD also targeted protesters' property—destroying cameras, phones, and eyeglasses; and confiscating bikes, backpacks, and other belongings.

6.      CPD officers' animus against Plaintiffs and other protesters is unmistakable— they regularly called protesters vile and vulgar names, often using misogynistic and homophobic words.  Officers were also aggressive, rude, disrespectful, and often affirmatively escalated encounters through taunts, shoves, pushes, and other inappropriate behavior at these protests.

7.      CPD's response to the summer 2020 protests is consistent with the CPD's long-standing policies and practices of using abusive tactics and excessive force against protesters seeking progressive social and political change.

8.    These systemic and ongoing violations continued to occur despite the City of Chicago being subject to a Consent Decree for almost two years.  CPD's documented failure to comply with the Consent Decree deadlines coupled with its consistently illegal and violent response to the summer 2020 protests demonstrate that the Consent Decree has entirely failed to create any meaningful change in the CPD.

9.    CPD's unconstitutional policies and practices against protesters has caused Plaintiffs significant harm, including the violation of their constitutional rights as well as physical, emotional, and mental injuries.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims arising under Illinois state law.

11.    Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

12.    Plaintiff Megan Angers is a 25-year-old[1] white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Angers attended a protest in Grant Park on July 17, 2020.

13.    Plaintiff Jamey Arnold is a 28-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Arnold attended a protest in Grant Park on July 17, 2020.

14.    Plaintiff Adriana Antunez is a 22-year-old Latinx resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Antunez attended a protest in Grant Park on July 17, 2020.

---

[1]  Plaintiffs' ages listed here are their ages at the time the original complaint was filed on November 19, 2020.

15.     Plaintiff Caroline Scott is a 24-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Scott attended a protest in Grant Park on July 17, 2020.

16.     Plaintiff Charlotte Vail is a 24-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Vail attended a protest in Grant Park on July 17, 2020.

17.     Plaintiff Michelle Zacarias is a 30-year-old Latinx resident of Berkeley, California who uses she/her pronouns. Plaintiff Zacarias attended a protest in Grant Park on July 17, 2020.

18.     Defendant City of Chicago is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois.  It is authorized under the statutes of the State of Illinois to maintain the Chicago Police Department, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible.  Defendant City was, at all times material to this Complaint, the employer and principal of the Defendant Officers.

19.     Defendant David Brown is the Superintendent of the Chicago Police Department. At all times relevant to the events at issue in this case, Defendant Brown was employed by the CPD.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Brown promulgated rules, regulations, policies, and procedures of the CPD. Defendant Brown is responsible for supervising all CPD officers and managing all operations at the CPD.  He is sued here in his official and individual capacities.

20.     Defendants Chicago Police Officers Jesse Chavez (#14182), Mark Styczynski (#5442), Kyle Gleeson (#3809), David Stepney (#3141), Mane Maravic (#18441), Dillan Halley (#7341), Arthur Young (#1289), Kevin Graves (#16260), William Murphy (#19214), William Schield (#946), Charles Rhein (#2164), Alexander Gonzalez (#4877), James Johnson (#2293),

Jose Rojas (#932), Brian Griffith (#8236), Thomas Oshaugnessy (#1247), Andrea Rodriguez (#18618), Jonathan Hernandez (#13181), and Luis Laurenzana (#19637) are City of Chicago employees with the CPD. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the CPD. They are sued in their individual capacity for violating Plaintiffs' rights guaranteed by the U.S. Constitution and Illinois state law.

## FACTUAL ALLEGATIONS

**I.** **The CPD's Violent and Unconstitutional Response to Protesters Throughout the Summer of 2020**

21. On May 25, 2020, Minneapolis police officers murdered George Floyd when they suffocated him to death while he was handcuffed in a prone position on the ground in broad daylight on the street. Floyd begged to breathe, for his mother, and for his life, and witnesses begged the officers to let him go, before he ultimately took his last breath.

22. Floyd's murder and the police murder of Breonna Taylor in her home in Louisville, Kentucky, in addition to recent police murders of too many additional Black people throughout the United States, sparked the largest social justice movement in the history of the United States and has included protests around the world against anti-Black police violence, white supremacy, systemic racism, and inequality.

23. Since May 29, 2020, there were numerous protests and actions throughout the City of Chicago—ranging in size from a few dozen people to thousands. These protests have occurred all throughout Chicago, including in the Loop and on the South, West, and North sides, and have been attended by people of all ages, races, and demographics. In particular, protests occurred on May 29–31, June 1, July 17, and August 15, 2020.

24. The CPD responded to these protests with brutal, violent, and unconstitutional tactics that were clearly intended to injure and silence protesters who were protesting their violence and the violence of other state actors.

25. CPD officers consistently targeted protesters who were peacefully exercising their First Amendment rights with unlawful, retaliatory, and lethal force.

26. Protesters often reported that CPD officers intentionally struck them on their head with batons with enough force to leave people bloodied and in some instances with serious concussions.



27. On June 23, 2020, the Chicago Reader published an in-depth examination of the CPD's use of lethal force, including baton strikes to the head, during the May 2020 protests (excluding protests in June, July, and August). The reporter documented:

> 83 baton strikes on at least 32 different people by officers, most captured on video. Nearly all appear to violate [CPD] policy, with more than half of the strikes on video involving police beating people who were already on the ground. Multiple videos also

show officers hitting protesters in the head with batons despite rules limiting these strikes to situations requiring deadly force.[2]

28.     The Chicago Reader article notes that these unlawful uses of force often occurred in full view of supervisors who failed to intervene and that most officers failed to report their uses of force.

29.     The CPD's brutal response to these protests and protesters also included police officers:

a.   driving CPD cars through crowds of protestors;

b.   punching protesters in the face;

c.   tackling protesters to the ground;

d.   kneeing protesters in the neck and back;

e.   kicking protesters in the legs to cause them to fall;

f.   jabbing batons into protesters' bodies;

g.   trapping protesters on bridges, pushing protesters stranded on bridges, pinning protesters against hard surfaces on bridges and other locations;

h.   using tear gas and pepper spray;

i.   dragging protesters through the streets;

j.   stomping on protesters on the ground; and

k.   beating protesters severely with batons.

These acts of violence were wholly unwarranted and there was no objectively reasonable basis to use such dangerous and violent force.

30.     CPD officers also targeted those the CPD has identified as protest marshals, legal observers, medics, or leaders with the most brutal violence apparently as part of a strategy to quell the protesters' free expression.

---

[2]  Andrew Fan and Dana Brozost-Keller, Cops Appear to violate use-of-force rules dozens of times at protests, Chicago Reader (June 23, 2020), https://www.chicagoreader.com/chicago/police-baton-use-of-force-protests/Content?oid=80849109.

31.     CPD officers also used violence on protesters who expressed concern or were protesting that CPD officers were harming other people at the protests.

32.     CPD officers also targeted those who were filming, or otherwise documenting police violence at the protests, by pushing, shoving, brutalizing, and harassing them in the midst of the protests.  Often this resulted in confiscated or damaged cameras and recording equipment and physical injury to protesters exercising their First Amendment right to record the police.

33.     CPD officers were also aggressive, rude, disrespectful, and often affirmatively escalated encounters through taunts, shoves, pushes and other inappropriate behavior at these protests.  CPD officers used particularly hostile language towards women and members of the LGBTQ community.

34.     CPD officers' animus against protesters is unmistakable—they regularly referred to protesters with terms that are vile, misogynistic, and anti-gay, including officers calling protesters "pussy," "cunt," "bitch," and "faggots," and repeatedly use the word "fuck" when issuing commands.  One officer threatened protesters by yelling "you fucking bitch," and "wait till I get my badge off, you fucking faggot."[3]

35.     CPD's response to the protests also reflects a pattern and practice of breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, glasses, goggles, backpacks, and, in some instances, canes used to assist with mobility.

36.     CPD has also engaged in a systemic practice of illegal searches of protesters, seizure of protesters, and false arrest of protesters.

---

[3]  John Wright, Chicago Officer Who Called Protester a 'F-king Faggot' Likely to Be Stripped of Police Powers: WATCH, Towleroad (June 11, 2020), https://www.towleroad.com/2020/06/chicago-officer-who-called-protester-a-f-king-faggot-likely-to-be-stripped-of-powers-watch/.

37.      Throughout the protests, the CPD has also engaged in racially motivated arrests of protesters, even though the protests were attended by multi-racial crowds of people, the majority of whom were white.  According to CPD records, during the initial weekend of protests (May 29 – 31) CPD arrested 2,172 people.  According to the Chicago Reader, the vast majority of those arrested, over 70 percent, were Black Chicagoans; however, only 32 percent of the City of Chicago identify as Black people.[4]

38.      Despite widespread evidence of unchecked police violence, throughout these events, former Mayor Lori Lightfoot praised the police for their "restraint."

39.      As of February 2021, protesters filed 591 protest-related complaints against CPD officers.  58% of those complaints alleged excessive force and 9% alleged verbal abuse. The number of protest complaints is so large, the Civilian Office of Police Accountability ("COPA") formed a specialized team of investigators solely dedicated to investigating these allegations.[5] As a result of COPA's preliminary investigations into the protest complaints, it referred 5 officers to state/federal law enforcement for potential criminal prosecution and has recommended that 8 officers be assigned to modified duty and/or be relieved of police power.  No other officers involved in protest-related abuses have been disciplined thus far.

40.      During a City Council budget hearing, COPA's Chief Administrator, Sydney Roberts, informed City lawmakers that "several themes were prevalent" throughout the protest complaints including "excessive use of batons," "excessive verbal abuse" and the failure of officers to comply with CPD's body camera policy as well as policies requiring Chicago police

---

[4]  Kiran Misra, Most of the people arrested at the protests were Black, Chicago Reader (June 30, 2020), https://www.chicagoreader.com/chicago/protest-arrests-racial-disparity/Content?oid=81018291.
[5]  Fran Spielman, CPA chief says recurring themes dominate complaints against CPD during civil unrest, Chicago Sun-times (Nov. 10, 2020), https://chicago.suntimes.com/2020/11/10/21559391/chicago-police-reform-copa-chief-recurring-themes-dominate-complaints-against-cpd-civil-unrest.

officers to display their names and badge numbers.[6] Chief Roberts also noted that these themes were so "consistent across multiple investigations" that she sent a memo to CPD leadership urging it to "take immediate action to address the deficiencies."[7] Upon information and belief, Defendant Superintendent Brown received Chief Robert's memo during the Summer 2020 uprisings and failed to take any action to redress the documented deficiencies.

41.     Pursuant to the relevant Chicago code provisions, Defendant Superintendent Brown is "responsible for the general management and control of the Police Department" and has "full and complete authority to administer the Department."[8] Defendant Superintendent Brown made all command decisions about the Chicago Police Department's systematic response to protesters during the 2020 uprisings. Defendant Superintendent Brown, through actions both explicit and implicit, authorized and directed the unlawful conduct described throughout this complaint. He encouraged and permitted Chicago police officers to target, attack, and harass protesters with violent animus and took no action to halt Chicago police officer's systemic violence against protesters for Black lives. Further, Defendant Superintendent Brown was physically present for at least one protest where he described standing "shoulder to shoulder" with Chicago police officers. During the protest(s) Defendant Superintendent Brown attended personally, he failed to intervene to stop officer violence and misconduct.

42.     In an apparent effort to justify and/or conceal his officers' brutal violence and unlawful conduct, Defendant Superintendent Brown made a number of false and misleading statements to the media about the Summer 2020 uprisings and the actions of Chicago police officers. For example, in reference to the August 15, 2020 downtown protest Defendant

---

[6]  https://www.chicagocopa.org/data-cases/protest-related-information/
[7]  *Id.*
[8]  Chicago Municipal Code § 2-84-040

Superintendent Brown stated that he and his officers "trailed along" the protesters until the protesters became "confrontational" and began assaulting officers. Defendant Superintendent Brown asserted that his officers did not engage in the practice of kettling (i.e., detaining a mass of people without justification and failing to provide people opportunities to leave). After an investigation, a media outlet labeled these assertions as "false" and found evidence of kettling and video depicting Chicago police officers chasing demonstrators and witnesses who described Chicago police officers attacking protesters who did not immediately disperse.[9] The same outlet also declared that Defendant Superintendent Brown publicly expressed a number of misleading and unsubstantiated negative statements about protesters including that they carry mace and were "agitators [who] hijacked a peaceful protest."[10]

43.     On October 13, 2020, Defendant Superintendent Brown acknowledged serious ongoing and systemic deficiencies within the CPD during his address to new CPD recruits. Defendant Superintendent Brown informed the recruits that "this civil unrest is about you." He informed them that they would be working alongside officers who "never should have been hired" and "who have lost their way" and that, despite the existence of these officers, the new recruits must "discern" right from wrong. During the same address, Defendant Superintendent Brown also acknowledged that "good cops don't tell on the bad cops" and that CPD has a culture of "protecting each other" and that it is difficult for officers to "hold each other accountable."[11]

## II.     Protesters' Rights Were Violated at Protests Throughout the City

---

[9]  Jim Daley and Jason Schumer, Fact-Checking Police Supt. David Brown on August 15, South Side Weekly (Sept. 2, 2020), https://southsideweekly.com/fact-checking-david-brown-august-15/.
[10]  *Id.*
[11]  'This Civil Unrest Is About You': Police Superintendent David Brown Gives Passionate Speech to New Recruits, NBC Chicago (Oct. 13, 2020), https://www.nbcchicago.com/top-videos-home/this-civil-unrest-is-about-you-police-superintendent-david-brown-gives-passionate-speech-to-new-recruits/2353284/.

### A.   May 29–31, 2020 Demonstrations Downtown

44.    In the wake of the police murders of George Floyd, Breonna Taylor, and other

Black people, there were massive demonstrations against anti-Black police violence in

downtown Chicago and the River North area over the weekend of May 29–31, 2020.









Chicago police officers clash with protesters Saturday near Kinzie and State streets as thousands in Chicago joined national outrage over the death of George Floyd, who died in police custody on Memorial Day in Minneapolis. | Ashlee Rezin Garcia / Sun-Times

### B. May 31, 2020 Demonstration in Hyde Park

45.     On May 31, 2020, several hundred individuals attended a protest in Hyde Park on Chicago's Southside.  During this action, Chicago police officers targeted Black organizers and activists with violent and often lethal force.  Chicago police officers used particularly violent and retaliatory force against prominent Black leaders who attempted to help other protesters navigate a protest dispersal.

### C. June 1, 2020 Demonstrations in Uptown and Old Town

46.     On June 1, 2020, several hundred people attended a demonstration in the Uptown neighborhood in Chicago that began in the late afternoon.  After a series of speeches, the demonstration began to march on City streets, including on Lake Shore Drive.  As the demonstration continued on throughout the evening, the numbers of protesters began to dwindle. As the numbers diminished, many protesters headed toward the Wilson stop of the CTA located at Wilson and Broadway.  At or near Wilson and Broadway, Chicago police officers without warnings advanced on protesters and attacked them with batons.

47.     During the afternoon of June 1, 2020, scores of high school students and others participated in a demonstration against anti-Black police violence in support of Black lives at around Division and Larrabee in Old Town, Chicago.  Chicago police officers, armed with shields and batons, and some with the use of bicycles, walled off the streets and eventually encircled the protesters.  Without issuing any orders to disperse, Chicago police officers then began using their bicycles, shields, or batons to push protesters back while yelling at them to move, even though the protesters had nowhere to go because they were hemmed in by Chicago police officers on all sides.

### D. July 17, 2020 Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park

48.     On July 17, 2020, hundreds of protesters participated in a demonstration to demonstrate solidarity for Indigenous people's struggles against colonization, genocide, and to oppose the prominent tribute to Christopher Columbus, embodied by the statue of him in Grant Park, Chicago.

49.     The demonstration started at Buckingham Fountain with a series of speeches and prayer, and later progressed into a march that headed south on Columbus Drive to Grant Park.

50.     At Grant Park, protesters marched into the park and surrounded the statue of Columbus, which was heavily guarded by Chicago police officers.

51.     A small group of individuals in the protest threw frozen water bottles and other objects at the Chicago police officers, causing the officers to retreat from the statue and the park. These handful of protesters then attempted to pull the statue down with rope.

52.     Chicago police officers then returned to the park attempting to retake the statue and in the process engaged in extreme forms of violence in retaliation for the actions of a small minority.



53.     Police officers descended into the park swinging their batons and hitting people's

heads and bodies.

54.     Defendant Officers Mark Styczynski (#5442), Kyle Gleeson (#3809), David Stepney (#3141), Mane Maravic (#18441), Dillan Halley (#7341), Arthur Young (#1289), Jesse Chavez (#14182), Kevin Graves (#16260), William Murphy (#19214), William Schield (#946), Charles Rhein (#2164), Alexander Gonzalez (#4877), James Johnson (#2293), Jose Rojas (#932), Brian Griffith (#8236), Thomas Oshaughnessy (#1247), Andrea Rodriguez (#18618), Jonathan Hernandez (#13181) and Luis Laurenzana (#19637) (hereinafter "the Individual Defendant Officers"), indiscriminately deployed pepper spray on the entire crowd of demonstrators, without justification, causing many people to experience trouble breathing, and engaging in other forms of violence.



55.     In addition to the excessive force, Chicago police officers forcibly took over 70 bicycles away from the protesters and refused to return them that evening.[12]

_____

[12] Monica Eng, What Happened to the 76 Bikes Chicago Police Took After Friday's Clash with Protesters?, WBEZ (July 21, 2020), https://www.wbez.org/stories/what-happened-to-the-76-bikes-chicago-police-took-after-fridays-clash-with-protesters/ae29fb14-3189-4044-9896-c1d416b5c515.



i.   **July 17, 2020 Chemical Agent and Baton Attacks on Plaintiff Megan Angers (Grant Park)**

56.   On July 17, 2020, Plaintiff Angers went to Buckingham fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

57.   After listening to speakers and watching ceremonies, Plaintiff Angers accompanied the march to the Columbus statue.

58.   When Plaintiff Angers arrived near the statute, she observed Chicago police officers surrounding the statute. The Individual Defendant Officers then sprayed pepper spray at Plaintiff Angers and fellow protesters without justification.

59.   Soon afterwards, Plaintiff linked arms with other protesters.

60.   Protesters with bicycles lined up in several rows to create a safe distance between protesters, including Plaintiff Angers, and the Chicago police officers.

61.   Chicago police officers on bicycles then formed another line, surrounding Plaintiff Angers and the other protesters.

62.     Plaintiff Angers then observed more Chicago police officers arrive, including many dressed in what appeared to be battle gear, and stand behind the Chicago police officers on bicycles.

63.     Plaintiff Angers did not hear Chicago police officers give any order to disperse. Rather, Plaintiff Angers heard a Chicago police officer give a command to fellow Chicago police officers to move forward. At that moment, with no warning or justification, the Individual Defendant Officers sprayed pepper spray on Plaintiff Angers and other protesters.

64.     Plaintiff Angers, who could not breathe, could barely see, and felt like her skin was on fire, dropped to the ground.

65.     Chicago police officers then began swinging their batons and throwing bicycles at the protesters, as Plaintiff Angers and other protesters tried to move out of harm's way.

66.     Plaintiff Angers started walking up a hill to see if anyone needed help. As she approached the top of the hill, an unidentified Chicago police officer threw her down the hill.

67.     Plaintiff Angers landed at the feet of another unidentified Chicago police officer, who struck her multiple times with his baton, injuring her leg and foot.

68.     A fellow protester and a medic helped Plaintiff Angers to rinse the chemical agent from her eyes and to hobble away from the scene of police abuse.

69.     Plaintiff Angers later obtained medical treatment for her injuries.

70.     Plaintiff Angers did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

71.     Plaintiff Angers did not commit any unlawful act and was engaging in constitutionally protected activity.

72.     At the time the officers used excessive force against Plaintiff Angers, the officers knew that Plaintiff Angers was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Angers.

73.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Angers suffered and continues to suffer, *inter alia,* bodily injuries, including bruises and contusions on her leg and foot, as well as pain and suffering, extreme mental distress, anguish, and fear.

### ii.     July 17, 2020 Chemical Agent Attacks on Jamey Arnold (Grant Park)

74.     On July 17, 2020, around 5:45 p.m., Plaintiff Arnold arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

75.     After listening to speakers and watching ceremonies, Plaintiff Arnold marched with the crowd to the Columbus statue.

76.     As more and more Chicago police arrived near the statue, Plaintiff Arnold observed officers become increasingly aggressive toward protesters, violently grabbing, dragging, and arresting them.

77.     Around 7:30 p.m., Plaintiff Arnold joined a semicircle with other protesters.

78.     While standing in the semicircle, without any warning or justification, the Individual Defendant Officers, from about 15 feet away, indirectly pepper sprayed Plaintiff Arnold, causing her to cough and gag and her eyes to burn.

79.     As she and other protesters stumbled back to find a place to wash off the chemical agent, Chicago police officers charged at the protesters and Plaintiff Arnold was indirectly pepper sprayed again by the Individual Defendant Officers.

80.     After recovering from the chemical agent, and helping others do the same, Plaintiff Arnold observed Chicago police officers forming a line.

81.     Plaintiff Arnold then joined other protesters in a line and linked arms for protection.

82.     Without warning or justification, a line of Chicago police officers charged at the line of protesters and the Individual Defendant Officers pepper sprayed Plaintiff Arnold and the others from about 5 feet away.

83.     Plaintiff Arnold turned around to flee as Chicago police officers charged, and felt the gas or pepper spray hit the back of her head, neck, and upper back, burning her skin.

84.     As Plaintiff Arnold was trying to leave, Chicago police officers continued to rush at her and the other protesters.

85.     Around 8:15 p.m., an unidentified Chicago police officer pushed Plaintiff Arnold down with his hands, causing her to fall backward onto another protester's bike and hit her left shoulder on the bike's handlebars. Plaintiff Arnold suffered severe shoulder pain as a result of this injury. Two other protesters helped Plaintiff up.

86.     Plaintiff Arnold and other protesters continued to be pushed, shoved, and yelled at by Chicago police officers as they tried to leave the park.

87.     Plaintiff Arnold did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

88.     Plaintiff Arnold did not commit any unlawful act and was engaging in constitutionally protected activity.

89.     At the time the officers used excessive force against Plaintiff Arnold, the officers knew that Plaintiff Arnold was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Arnold.

90.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Arnold suffered and continues to suffer, *inter alia,* bodily injuries, including burns to her skin and severe left shoulder pain, as well as pain and suffering, extreme mental distress, anguish, and fear.

### iii.     July 17, 2020 Abuse of Plaintiff Adriana Antunez (Grant Park)

91.     On July 17, 2020, in the late afternoon, Plaintiff Antunez arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong).

92.     After listening to speakers and watching Indigenous ceremonies, Plaintiff Antunez marched with the crowd to the Columbus statue.

93.     Plaintiff Antunez maintained her distance from the statue, but still felt the effects of chemical agents spread in the air by the Individual Defendant Officers. She observed a young woman who had been pepper sprayed in the eyes and assisted her.

94.     Plaintiff Antunez then observed Chicago police officers shove her friend, who had his hands in the air, to the ground for no justifiable reason, and beat him with batons while he curled up into a ball. Her friend sustained bruises on his back and his knee was bloodied, with the blood soaking through his pant leg. After the officers stopped beating him, Plaintiff Antunez dragged him to a hill.

95.     While Plaintiff Antunez was holding her friend who had been beaten, officers started to approach them and shouted to move. Without giving Plaintiff Antunez any opportunity to move, and for no justifiable reason, an unidentified Chicago police officer dug his baton

holding it horizontally into Plaintiff Antunez's chest. The officer touched Plaintiff Antunez's breast, which was particularly traumatic for her because she is a survivor of sexual assault. Plaintiff Antunez cried out, "That's my chest. You're touching my chest. That's still my chest. You're touching my boobs," but despite her pleas, the officer continued to push his baton into her stomach and her chest.

96.     Shortly thereafter, without any warning or justification, the Individual Defendant Officers started hosing protesters with pepper spray. Plaintiff Antunez observed an unidentified Chicago police officer unload a red canister of pepper spray on a young girl next to her. When Plaintiff Antunez turned to try to shield herself and another friend from the pepper spray, Plaintiff Antunez felt the effects of the spray on her neck. Plaintiff Antunez's throat started burning as a result of the spray and she began choking on the spray. Plaintiff Antunez tried to help others around her who had been directly pepper sprayed, but the police officers refused to let her help them.

97.     Chicago police officers continued shouting at protesters to move while simultaneously shoving them aggressively with batons to push them further up the hill. As Plaintiff Antunez and her friends were complying with the officers' orders and moving up the hill away from the officers, she and her friend were shoved by one or more unidentified officers.

98.     Plaintiff's friend, who had been beaten and also pepper sprayed in the eyes, tripped after being shoved by the officers and fell to the ground. When Plaintiff Antunez caught his fall, her hands got coated with pepper spray.

99.     As Plaintiff Antunez was attempting to address her friend's injuries after he fell, an officer towered over them and yelled at them to keep moving. After Plaintiff Antunez got up, officers continued to shove her, her friends, and other protesters over a concrete barrier.

100.     Plaintiff Antunez sustained bruises on her breasts due to the Defendant Officer striking her repeatedly with his baton.

101.     Plaintiff Antunez also endured hours of pain due to being pepper sprayed. Plaintiff Antunez repeatedly washed her hands and took multiple showers to try to alleviate the pain, and threw up in the shower while trying to wash away the spray.

102.     Plaintiff Antunez also sustained bruises on her legs and scratches on her knees from being shoved to the ground and climbing over the concrete barrier to get away from the officers.

103.     Plaintiff Antunez did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

104.     Plaintiff Antunez did not commit any unlawful act and was engaging in constitutionally protected activity.

105.     At the time the officers used excessive force against Plaintiff Antunez, the officers knew that Plaintiff Antunez was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Antunez.

106.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Antunez suffered and continues to suffer, *inter alia,* bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

   **iv.     July 17, 2020 Chemical Agent Attacks on Plaintiff Caroline Scott (Grant Park)**

107.     On July 17, 2020, at approximately 5:00 p.m., Plaintiff Scott arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

108.     After the rally, Plaintiff Scott marched with the crowd to the Columbus statue.

109.     While near the Columbus statue, Plaintiff Scott and other white individuals formed a line at the front of the group of protesters.

110.     Chicago police officers in full riot gear approached the line of protesters. Plaintiff Scott then observed the officers look at the line of white protesters, and for no justifiable reason, grab the one Black man who was standing next to the line, pull him to the ground face down, and arrest and remove him from the protest.

111.     Sometime between 7:00 p.m. and 8:00 p.m., Plaintiff Scott started to notice the presence of pepper spray in the air that had been sprayed by the Individual Defendant Officers. Plaintiff Scott started to have a difficult time breathing and her eyes started to burn.

112.     Shortly thereafter, an unidentified Chicago police officer then directly tear gassed or pepper sprayed three people about six to ten feet away from Plaintiff Scott without any warning or justification. Plaintiff Scott watched the yellow and white spray coming out and immediately felt the effects of the chemical agent and began coughing and struggling to breathe. Plaintiff Scott felt her skin and her eyes burning.

113.     Plaintiff Scott backed up and tried to recover from the chemical agent. Plaintiff Scott had to remove her mask and share water with other protesters to combat the gas or pepper spray, which was especially dangerous given the ongoing global pandemic.

114.     After recovering from the gas or pepper spray, Plaintiff Scott attempted to leave the protest. While trying to leave the park, a Chicago police officer screamed at Plaintiff Scott to walk faster. Plaintiff Scott was trying to wait for her friend whose bike was damaged by officers. As she was leaving, Plaintiff Scott observed many protesters who were bloody and beaten by officers.

115.     After returning home, Plaintiff Scott washed her mouth out and noticed that she kept spitting out a red chemical substance. When she woke up the next day, her arms were still burning, and she was still spitting out the red chemical substance from her mouth.

116.     Plaintiff Scott did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

117.     Plaintiff Scott did not commit any unlawful act and was engaging in constitutionally protected activity.

118.     At the time the officers used excessive force against Plaintiff Scott, the officers knew that Plaintiff Scott was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Scott.

119.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Scott suffered and continues to suffer, inter alia, bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

### v.     July 17, 2020 Chemical Agent Attacks on Plaintiff Charlotte Vail (Grant Park)

120.     On July 17, 2020, Plaintiff Vail and her friends arrived at Buckingham Fountain around 4:30 p.m. to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong).

121.     After listening to speakers and watching Indigenous prayer ceremonies, Plaintiff Vail and her friends began marching toward Columbus statue around 6:30 p.m.

122.     When Plaintiff Vail realized that protesters at the front of the march were having a standoff with police near the statue, Plaintiff Vail tried to make her way toward the front to figure out if anyone needed help. While walking, Plaintiff Vail felt pepper spray that was sprayed in the air by the Individual Defendant Officers. Plaintiff Vail's throat instantly closed up

and she could not breathe from the gas. She fell to the ground and started coughing on her hands and knees.

123.    After Plaintiff Vail recovered, she got up and ran to find her friends. She then ran to assist other protesters who were trying to form walls to protect against attacks from the Chicago police.

124.    Plaintiff Vail observed more Chicago police arrive by the statue and then was pepper sprayed again by the Individual Defendant Officers. Plaintiff Vail fell to the ground, unable to breathe. She started to crawl away while gasping, coughing, and vomiting.

125.    Someone picked her up and carried her to the medic encampment which was located near the base of a bridge. She laid down in that area and was given water.

126.    As Plaintiff Vail was in the medic encampment, she observed the Chicago police continue to push the protesters back toward her. At that point she was pepper sprayed a third time by the Individual Defendant Officers. She again could not breathe and crawled and then ran down a hill to get away from the gas.

127.    Eventually Plaintiff Vail found her friends and they left the area.

128.    Plaintiff Vail continued to vomit when she got home, and also had bad cramps.

129.    Plaintiff Vail did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

130.    Plaintiff Vail did not commit any unlawful act and was engaging in constitutionally protected activity.

131.    At the time the officers used excessive force against Plaintiff Vail, the officers knew that Plaintiff Vail was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Vail.

26

132.    As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Vail suffered and continues to suffer, *inter alia,* bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

###### vi.    July 17, 2020 Abuse of Michelle Zacarias (Grant Park)

133.    On July 17, 2020, at approximately 4:00 p.m., Plaintiff Michelle Zacarias arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

134.    Plaintiff Zacarias is an amputee, with her right leg amputated above the knee, and on July 17th she was wearing shorts which revealed her prosthetic leg.

135.    After listening to speeches and watching Indigenous prayer ceremonies, Plaintiff Zacarias began marching with the group of protesters to the Columbus statue in Grant Park.

136.    Several minutes after arriving to the northwest of the statue, Plaintiff Zacarias observed the Individual Defendant Officers spraying a red chemical agent at the group of protesters assembled near the statue.

137.    The chemical agent caused Plaintiff Zacarias to experience irritation in her lungs and burning on her skin.

138.    Approximately 30 minutes later, Plaintiff Zacarias observed a young woman who appeared to be distressed because of an unidentified Chicago police officer's aggression and threatening behavior.

139.    Plaintiff Zacarias stood between this woman and the unidentified Chicago police officer, seeking to de-escalate the situation while maintaining a distance of several feet from the officer.

140.    The unidentified Chicago police officer grabbed Plaintiff Zacarias' arm and shoved her to the ground.

141.    Plaintiff Zacarias looked up at the Chicago police officer and he said to her "how did that feel? Did you like that?" while he banged his baton against his shield in a threatening manner.

142.    After getting up, Plaintiff Zacarias located a friend that she attended the protest with and left the area approximately 15 minutes later.

143.    Plaintiff Zacarias did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

144.    Plaintiff Zacarias did not commit any unlawful act and was engaging in constitutionally protected activity.

145.    At the time the officers used excessive force against Plaintiff Zacarias, the officers knew that Plaintiff Zacarias was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Zacarias.

146.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Zacarias suffered and continues to suffer, *inter alia,* bodily injuries, including bruising to her arm, as well as pain and suffering, extreme mental distress, anguish, and fear.

### E.  August 15, 2020 Demonstration Downtown

147.    On August 15, 2020, hundreds of protesters participated in a demonstration downtown that began in the afternoon.  The protesters started at Millennium Park and marched through the streets of downtown before Chicago police officers blocked their route and became aggressive.  Officers surrounded protesters on all sides, engaging in the unlawful tactic of

"kettling," and brutally beat many protesters, including youth.









III.  **CPD's Policy and Practice Failures: Using Force Against Protesters, Unreasonable Force When No Force Is Required, and Failure to Discipline/Code of Silence**

148.    The City's long-standing policies, practices, and customs for shutting down protests are the direct and proximate cause of the constitutional violations outlined in this Complaint.  Protesters suffered abuse at the hands of Chicago police officers in different parts of the City, however, each instance of harm was a direct result of the City's deficient policies and practices as detailed below.

A.  **CPD's Policy and Practice of Using Unreasonable Force, Violence, and False Arrests to Quell Protest**

149.    CPD's actions during the summer of 2020 were far from isolated incidents. The violations of Plaintiffs' constitutional rights were the result of the CPD's longstanding policies and practices of attempting to quell protest through unconstitutional tactics against protesters including excessive force, violence, and false arrests.

150.    CPD has demonstrated a widespread practice of inflicting unconstitutional violence on people exercising their right to assemble and protest, along with unlawfully depriving people of their freedom in retaliation for their protest activities. Some notable examples include:

    a.   On April 23, 1990, CPD responded to an AIDS Coalition to Unleash Power ("ACT-UP") protest by pushing, shoving, tackling, and throwing protesters to the ground, and falsely arresting protesters.

    b.   On December 29, 1990, CPD responded to a Gulf War protest by striking protesters in the face, placing them in choke-holds, and conducting false arrests against bystanders opposing their conduct and concert-goers simply leaving the venue.

c.  On June 24, 1991, CPD used forced against protesters at another ACT-UP demonstration.  One officer threw a protester on the pavement, punched him in the face, and falsely arrested him.  A dozen other ACT-UP activists who suffered serious injuries including bruises and contusions, a fractured wrist, and head injuries all filed excessive force lawsuits, which were settled by the City for substantial money damages.

d.  During the Democratic National Convention in August 1996, CPD falsely arrested and injured several protesters.  More than half a dozen plaintiffs brought an excessive force and false arrest lawsuit that was settled by the City for substantial money damages.

e.  On March 20, 2003, CPD responded to a mass demonstration and march against the War in Iraq by trapping over 800 protesters and by-standers on Chicago Avenue without giving people orders to disperse and opportunities to leave, and arresting over 500 people.  CPD also engaged in excessive force, which included storming into the crowd and striking people with batons.  A federal class action lawsuit filed against the City on behalf of the protesters, which included a claim for municipal liability under *Monell*, ultimately settled for approximately $15 million.

f.  On August 17, 2011, CPD responded to an anti-deportation demonstration by hitting two legal observers in the face and falsely arresting the legal observers after they attempted to assist a young woman and child that had been battered by a CPD officer.

g.  On March 11, 2016, CPD responded to an anti-Trump demonstration by pushing

32

protesters with batons, physically attacking protesters, and falsely arresting

protesters. One woman was thrown to the ground by her hair, kicked on her body,

and beat with batons on her head and body, and falsely arrested by CPD

officers. CPD officers also attacked and falsely arrested a member of the press.

### B.  CPD's Widespread Practice of Excessive Force

151.  The CPD's violence and brutality against protesters is consistent with the

Department's widespread policy and practice of using aggressive tactics that unnecessarily

escalate encounters with individuals, increase tensions, and lead to excessive force. The CPD

also fails to de-escalate encounters when it would be reasonable to do so. Even where some use

of force may be justified, officers, as a matter of practice, use a higher level of force than is

objectively reasonable. CPD's violence against protesters—and particularly against protesters

who stand in opposition to police violence, corruption, and racism—is an extension of CPD's

long standing, widespread practice of excessive force. This widespread practice of violence has

been documented and acknowledged by the DOJ, the Chicago Police Accountability Task Force

(the "Task Force"), the federal courts, civil rights activists, City officials—including the Mayor

and Superintendent of Police—and, above all, by the Black communities most targeted by CPD

for violence and abuse.

152.  In April 2016, the Task Force released a report about the system of training,

accountability, and oversight of CPD officers (the "Task Force Report"). It found: "The

community's lack of trust in CPD is justified. There is substantial evidence that people of

color—particularly African-Americans—have had disproportionately negative experiences with

the police over an extended period of time. There is also substantial evidence that these

experiences continue today through significant disparate impacts associated with the use of

force, foot and traffic stops and bias in the police oversight system itself."

153.     The Task Force reported that racial bias in the CPD was "not a thing of the past."

Instead, "data establishes that CPD's use of force disproportionately affects people of color.  The

same is true for foot and traffic stops.  These enforcement actions have deepened a widespread

perception that police are indiscriminately targeting anyone and everyone in communities of

color without making individualized determinations of reasonable suspicion of criminal conduct.

Racial bias extends to other areas as well, including the police oversight system itself."

154.     In 2015, the Department of Justice, Civil Rights Division, Special Litigation

Section, and the U.S. Attorney's Office for the Northern District of Illinois jointly initiated an

investigation of the CPD and the accountability body charged with overseeing the police—the

Independent Police Review Authority ("IPRA").  This investigation was undertaken to determine

whether the CPD was engaging in a pattern or practice of unlawful conduct and, if so, what

systemic deficiencies or practices within the CPD, IPRA, and the City constituted this pattern or

practice.  The DOJ investigation assessed the CPD's use of force, and addressed CPD policies,

training, reporting, investigation, and review related to officer use of force.

155.     In January 2017, the DOJ finished its investigation and released its findings (the

"DOJ Findings Report").  In accordance with the allegations herein, the DOJ Findings Report

concluded that "CPD officers engage in a pattern or practice of using force that is unjustified,

disproportionate, and otherwise excessive  . . . CPD officers use unnecessary and unreasonable

force in violation of the Constitution with frequency, and that unconstitutional force has been

historically tolerated by CPD."

156.     Based on its review of complaints, the DOJ determined that uses of force by the

CPD "were not aberrational."  Instead, "our holistic review of this information, combined with

our investigation of CPD's training, supervision, accountability, and other systems, give us reasonable cause to believe that the unreasonable force we identified amounts to a pattern or practice of unlawful conduct."

157.    The CPD's pattern or practice of unreasonable force also includes the unnecessary, unjustified use of excessive, less-than-lethal force, including with Tasers, batons, emergency takedowns, body slamming, and hand-to-hand combat.  According to the DOJ, the use of unreasonable force to quickly resolve non-violent encounters is a recurrent issue at CPD.

158.    The CPD, as a matter of pattern and practice, relies upon overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force.  The CPD also fails to de-escalate encounters when it would be reasonable to do so.

159.    The DOJ observed this trend of escalation in shootings, finding that CPD officers regularly engaged in "unnecessarily escalating confrontations," which resulted in "avoidable uses of force and resulting harm, including deaths."  The DOJ also reported that CPD officers regularly use retaliatory force against people who object to being stopped, without cause.

160.    In one incident recorded by the DOJ, officers forcibly brought a man to the ground because he stiffened and locked his arms while they were arresting him for walking his dog without a leash and refusing to present identification.  Officers provided no justification for the level of force they used.  They failed to explain why they did not attempt to resolve the situation with common (and common sense) de-escalation techniques.

161.    The Task Force similarly found "many examples of CPD encounters with citizens in routine situations that have gone tragically wrong."  The Task Force acknowledged widespread reports from Chicagoans that officers approach "routine situations with an overaggressive and hostile demeanor, using racially charged and abusive language."

162.    The DOJ investigation and the Task Force findings directly resulted from the uprisings that occurred in the aftermath of the 2015 release of the video depicting CPD Officer Jason Van Dyke murder Black teenager Laquan McDonald.  Some of the groups that provided foundation, leadership, and support for these uprisings, including Black Lives Matter-Chicago, filed a lawsuit seeking a consent decree that would govern CPD operations and prevent future abuse and racialized violence and won the right to enforce the Consent Decree that ultimately resulted from litigation filed by the Illinois Attorney General.[13]  Even though the Consent Decree contains a number of provisions that should have remedied the policy and practice violations described in this Complaint, as described fully below, CPD has entirely failed to conform its practices to Consent Decree mandates.

### C.    The CPD Has Wholly Disregarded Consent Decree Requirements

163.    An Independent Monitoring Team ("IMT"), overseen by Judge Robert M. Dow, Jr., assesses the City and CPD's compliance with the Consent Decree in biannual reports.  (Each report assesses a portion of the paragraphs of the Consent Decree and will assess all paragraphs at the end of three years.)  The IMT has so far issued two reports with a clear trend across both: the City and CPD have failed to comply with the reform schedule.  In the first report, the City and CPD failed to meet even preliminary compliance standards for 52 of 67 paragraphs of the Consent Decree.  The City and CPD missed 37 of 50 deadlines.  The City's record in the second report was no better.  In that report, filed on June 18, 2020, the City and CPD missed 52 of 74 deadlines.

164.    The City's non-compliance and missed deadlines bear directly on CPD's civil

---

[13]  Organizations represented by the ACLU of Illinois and the Attorney General of the State of Illinois later filed their own lawsuits and eventually, these efforts resulted in a Consent Decree that has been in effect since April 2019.

rights abuses at the recent protests. CPD failed to create adequate policies and procedures for use of force, impartial policing, and crisis intervention and failed to revise relevant use of force and accountability policies.

165.    In its First Report (1:17-cv-06260 "Report 1") filed on November 15, 2019, the IMT described the CPD's consistent failures across the assessed paragraphs of the Consent Decree. In terms of impartial policing, ¶ 58 requires that the CPD establish a policy to permit "members of the public to photograph and record CPD officers in the performance of their law enforcement duties." CPD failed to meet any level of compliance with the paragraph or the corresponding deadline in the Consent Decree. Even so, the IMT described the ¶ 58 policy as "necessary" given CPD unwillingness to be photographed. (Report 1 at 50.) Furthermore, the CPD refused to allow for community engagement in the creation of the draft policy, which is a requirement of the Consent Decree. *See* ¶ 52.

166.    In terms of use of force, CPD missed 16 out of 19 deadlines, and failed even preliminary compliance for 19 out of 25 Consent Decree paragraphs. CPD did not achieve secondary or full compliance in any paragraphs concerning use of force. CPD's use of force failures break down into policy and reporting deficits. When reviewing the CPD's approach to use of force generally, the IMT explicitly recommended that "the CPD provide more detailed examples of various de-escalation techniques in each policy, rather than rely on the boilerplate language that is at the front end of each policy." (Report 1 at 85.)

167.    The Consent Decree requires that every two years, the IMT conduct a reliable, representative, and comprehensive survey of broad cross sections of Chicago's communities. The most recent survey, released in August 2020, reveals that community members are well aware of CPD's failures to comply with the Consent Decree requirements. Less than half of

people surveyed believe that CPD generally uses forces appropriately or adequately de-escalates situations.

168.    The Consent Decree provisions related to the allegations in this Complaint include a number of provisions, that, if meaningfully implemented by the CPD prior to the Summer 2020 uprisings, were intended to prevent the injuries detailed in this Complaint.  These provisions include the following requirements and prohibitions:

a.   Chicago police officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified.

b.   When safe and feasible to do so, Chicago police officers must give verbal commands and warnings prior to, during, and after using an impact weapon.

c.   Chicago police officers must receive training on proper use of an impact weapon before being permitted to carry such a weapon.

d.   Chicago police officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object.  Chicago police officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene.

e.   Chicago police officers may only use force for a lawful purpose.  Chicago police officers are prohibited from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g.,

lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct).

f.   The CPD will clarify in policy that Chicago police officers will permit members of the public to photograph and record Chicago police officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy.

g.   Chicago police officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used).

h.   Chicago police officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety.  CPD will continue to require that the Superintendent or his or her designee provides authorization before OC devices are used for noncompliant groups, crowds, or an individual taking part in a group or crowd.

i.   The CPD will require that all Chicago police officers interact with all members of the public in an unbiased, fair, and respectful manner.  The CPD will require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language.

**D.   The CPD's Widespread Code of Silence and Failure to Discipline Abusive Officers**

169.   The CPD has maintained its widespread practice of excessive force for well over 100 years through promoting the "code of silence" and the failure to discipline Chicago police officers trained and required to lie or remain silent about police misconduct, including the use of excessive force and discriminatory policing.  Any officer who violates this code is penalized by

39

the CPD.

170.     Police officers are educated at the CPD about the tenets of this code of silence. They are instructed: "[W]e do not break the code of silence.  Blue is Blue.  You stick together.  If something occurs on the street that you don't think is proper, you go with the flow.  And after that situation, if you have an issue with that officer or what happened, you can confront them.  If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner.  But you never break the code of silence."

171.     In *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that, as of February 2007, the City of Chicago "had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

172.     In December 2015, in a speech to Chicago aldermen, Mayor Emanuel acknowledged that Chicago police use a "code of silence" to conceal abuses and wrongdoing by their colleagues.

173.     In April 2016, the Task Force found that the code of silence is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

174.     The DOJ investigation confirmed that the code of silence pervades the CPD: "City, police officers and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence."  One CPD sergeant informed DOJ investigators that "if someone comes forward as a whistleblower in the Department, they are dead on the street."  The code of silence extends, as the DOJ found, to sergeants and other supervisors who take affirmative actions to cover up the misconduct of their subordinates.

175.    The DOJ determined that the code is "strong enough to incite officers to lie even when they have little to lose by telling the truth."  This is because "officers do not believe there is much to lose by lying."

176.    The CPD maintains a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, including the Defendant Officers.  Consequently, the City allows its officers to believe they can abuse and violate the rights of individuals without consequence.  These policies, practices, and customs directly contribute to the code of silence, and to the violations of Plaintiffs' constitutional rights.

177.    According to the Citizens Police Data Project, between 1988 and 2020, only 3% of all complaints that CPD officers engaged in excessive force resulted in any discipline for the officer and only 1% of complaints related to First Amendment violations resulted in discipline. The DOJ reported that in the rare instance where a complaint of misconduct was sustained, "discipline is haphazard and unpredictable, and is meted out in a way that does little to deter misconduct."

178.    Given the systematic lack of discipline, CPD officers are allowed to amass dozens of complaints without penalty.  From 2007 to 2015, more than 1,500 Chicago police officers acquired ten or more Complaint Registers ("CRs").  Sixty-five of these officers had 30 or more CRs.  These numbers do not reflect the entire disciplinary history (e.g., pre-2007) of these officers.  They also underreport the problem.  While the CPD collects data on officer performance, including complaints and lawsuits, data is often incomplete and analysis is limited.

179.    Given the lack of effective review or discipline, officers often use the same or similar language to justify their use of force.  As the DOJ determined: "We saw many instances where officers justified force based on a boilerplate description of resistance that provides

insufficient specificity to understand the force used or resistance encountered." The CPD regularly accepts such insufficient documentation without question, even when an officer's use of force is suspect or gives rise to a formal complaint.

180.    While a number of Consent Decree provisions aim to eliminate the code of silence, the CPD has failed to comply with these terms. IMT reports overarching concerns about the entire complaint process. Specifically, the CPD failed to implement a policy in which the public knows how to submit complaints and that they may do so in multiple ways (¶¶ 425-26). The IMT found that, for anyone looking for more information on filing complaints, the reporting page and helpful resources are hard to find. The CPD reporting website is not user friendly, especially for non-English speakers.

181.    Furthermore, the CPD failed to ensure that officers who report misconduct receive protection (¶ 436). The CPD also failed to create a written policy detailing how complaints will be transferred to the Accountability Sergeant (¶ 457). The draft policy the CPD created "does not specifically address why, when, or how an investigation will be transferred." Further, the CPD has failed to support the implementation of a "completely anonymous, double-blind safe space portal" developed by the Officer of Inspector General, Joseph Ferguson. The portal intended to facilitate anonymous complaints from Chicago police department officers, but CPD has failed to take the actions necessary to ensure that it is used to defeat the code of silence.

182.    In the Second IMT Report (1:17-cv-06260), filed June 18, 2020, the CPD continued its pattern of systematic non-compliance with the assessed paragraphs of the Consent Decree. The CPD's failures relate directly to the abuses witnessed at the recent protests.

**E.  Governmental Reports and an Investigation by the Federal Consent Decree Monitor Document CPD's Widespread Policy and Practice Violations During the 2020 Uprisings**

183.    In February 2021, the Chicago Police Department released a 26-page report: *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 12, 2020*.[14]  CPD's After Action report failed to address many of the obvious policy and practice failures identified throughout this complaint (including but not limited to the use of lethal force against peaceful protesters).  However, in this report, the CPD makes a number of key admissions about its failed response to the 2020 uprisings.  Those admissions include:

   i.    CPD officers were not prepared to respond to "large-scale, unplanned incidents."[15]

   ii.   CPD's training failed to prepare newer officers for wide scale protests and CPD officers failed to comply with existing policies regarding mass arrests.[16]

   iii.  CPD officers were deployed to respond to the protests without any "specific plans"—a decision the CPD calls "ineffective."[17]

   iv.   "[S]ome Department members were observed during the Events with their names and/or badges removed from their uniforms or otherwise obscured in violation of Department policy."[18]

184.    The CPD's After Action report is also important for what it omits.  For example, it failed to note CPD officer's well documented policy violations relating to batons and other

---

[14] *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 12, 2020,* THE CHICAGO POLICE DEPT. (February 2021)  https://home.chicagopolice.org/wp-content/uploads/2021/02/AAR_FINAL_2-4-21.pdf (hereinafter "CPD After Action Report").

[15] *Id.* at 5.

[16] *Id.* at 6, 9.

[17] *Id.* at 8.

[18] *Id.*

uses of force.[19]  The report also fails to mention the physical and emotional trauma protesters described during federal court proceedings—yet it described in some detail the harm suffered by the business community.[20]  The report notes that in the wake of the 2020 uprisings, the CPD secured donations of 1,650 ballistic helmets with Kevlar protection and laser beam reflections that will protect officers from "blunt trauma."[21]  Yet it is silent about any concrete action the CPD plans to take to protect protesters from further harm at the hands of CPD officers.

185.    Also in February 2021, the Officer of the Inspector General for the City of Chicago released a Report on Chicago's Response to George Floyd Protests and Unrest.[22]  That report was based on "thousands of documents" and more than 70 interviews conducted with CPD officials.[23]  The OIG Protest Report also relied upon testimony from protesters provided during federal court proceedings, arrest reports, and an analysis of over 100 hours of body worn camera footage.[24]  Based on this information, the OIG made the following findings:

> i.    CPD made more than 1,500 related arrests between May 29 and June 7, 2020. The OIG documented that CPD failed to train officers on mass arrest procedures and held protesters "without proper documentation" and "threatened" the safety of protesters through lengthy delays in

---

[19] Both the Inspector General and the Independent Monitor detail CPD's force-related violations making CPD's own omission all the more troubling. *See also Report on Chicago's Response to George Floyd Protests and Unrest,* CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL, 15 (February 18, 2021)  https://igchicago.org/wp-content/uploads/2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf ("Many participants and observers who gave testimony after these events described dangerous baton strikes and other reportable uses of force that are not reflected in CPD's reported data. CPD's after-action report does not acknowledge and does not attempt to rebut these claims.").

[20] CPD After Action Report, at 6.

[21] *Id.* at 14.

[22] *Report on Chicago's Response to George Floyd Protests and Unrest,* CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL, 15 (February 18, 2021)  https://igchicago.org/wp-content/uploads/2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf (Hereinafter "OIG Protest Report")

[23] *Id.* at 6.

[24] *Id.* at 7.

transportation and processing.[25]  The report further describes CPD's arrest related records as "uneven and incomplete."[26]

    ii.  CPD officers detained protesters for prolonged time periods: "on average, arrestees were detained for a total of 14.0 hours.  The briefest total detention time recorded was 1.2 hours and the longest was 53.3 hours."[27]

    iii.  The OIG Protest Report contains extensive documentation regarding CPD's failures to "fulfill its force reporting obligations" and to "provide clear and consistent guidance to officers on reporting obligations."[28]  The report notes that there was significant confusion among "CPD's highest ranks" and "rank and file" members about the reporting requirements during the uprisings.  As a result, "CPD underreported uses of baton strikes and manual strikes, further resulting in an inadequate record of severe and potentially out of policy uses of force."[29]

    iv.  Superintendent Brown provided CPD officers with a general authorization for the use of OC spray when he considered "looting and violence" to be widespread throughout the city.[30]  He further authorized the use of OC spray during "situations involving large crowds acting as non-compliant groups, active resisters and assailants."[31]

    v.  On May 30, Mayor Lori Lightfoot herself authorized the use of O.C. spray

---

[25] *Id.* at 9.

[26] *Id.*

[27] *Id.* at 91.

[28] *Id.* at 9.

[29] *Id.*

[30] *Id.* at 108

[31] *Id.* at 109.

against protesters at Trump Tower, many of whom were peaceful protesters.[32]

vi. Despite these relatively limited authorizations, CPD officers reported that they used OC spray on peaceful protesters, including in efforts to "move protesters off the bridges" and "to slow down the movement of protesters through the city."[33]

vii. The OIG report also documented that CPD's SWAT team deployed OC spray against crowds 85 times on May 30, 2020.[34] However, because of the lack of accurate reporting, CPD officers used personal OC spray (and failed to report it) on far more occasions.

viii. The OIG Protest Report further describes how CPD exempted from review force the CPD officers used during the uprisings. None of the CPD officer's uprising force was reviewed by the Force Review Division, which conducts internal and non-disciplinary reviews of force in order to ensure "reporting obligations are met" and to identify "tactical, equipment or policy concerns."[35] As a result, CPD officer use of force during the uprisings was not subject to any meaningful accountability process. The report further notes that multiple reports documenting mass use of OC spray at different locations contained identical language justifying the use OC spray.[36] The use of boiler plate language to justify CPD officer use of

---

[32] *Id.*

[33] *Id.*

[34] *Id.* at 49.

[35] *Id.* at 110.

[36] *Id.* 111.

force against different people in different locations further demonstrates the complete breakdown of reporting and force related accountability processes.

ix. The OIG Protest Report describes other forms of CPD violence during the uprisings. Specifically, the report documents that "protesters reported seeing and experiencing apparently indiscriminate uses of force by CPD members. They describe seeing CPD members tackle, punch and use batons to strike peaceful protesters in the head and neck."[37]

x. CPD policy restricts the circumstances under which officers can use baton strikes, yet despite the existence of this policy the OIG found evidence of widespread policy violations during the uprisings.[38] Under CPD policy, baton strikes to the head are considered lethal force and can only be used against people attempting to harm CPD officers. The OIG documented that CPD officers both failed to accurately report these instances of lethal force and that "reports from community members who participated in the protests suggest that CPD members' use of batons was both substantially more widespread and more dangerous than indicated . . . by officers."[39]

xi. The OIG Protest Report describes how, given CPD's reporting failures, it is difficult to specifically quantify the number of protesters who were subject to lethal force by CPD officers, but notes that community member and protesters provided compelling narratives of this widespread policy

[37] *Id.* at 37.
[38] *Id.* at 95.
[39] *Id.* at 113

violation. ". . .[C]ommunity members. . . describe multiple instances of baton strikes. One community member reported seeing people beaten with batons at the protests "tens of times." Another described seeing someone beaten "on the ground while handcuffed." The testimonials in court included descriptions of protesters beaten with batons "until they were bleeding," and protesters struck with batons in response to minor provocations by someone else (e.g., the throwing of a water bottle). Ghian Foreman, President of the Chicago Police Board, gave a public statement that he was "a victim of police aggression" when he was struck five times in the legs with batons while walking through the scene of a protest."[40]

xii. The OIG Protest Report notes that on May 30, 2020, "CPD officers used their batons to push protesters off the bridge onto Lower Wacker Drive. Accounts from protesters on the bridge note that they did not hear a dispersal order before officers began to push them with batons. . . During the push, protesters described being beaten with officers' batons, punched, and kicked as CPD tried to clear the bridge"[41]

xiii. The OIG report includes summaries of body worn camera footage that further documents the policy and practice violations that give rise to the Plaintiffs' claims. Including:

a. During one incident, body worn camera depicts CPD officers ignoring a protester who requested seizure

---

[40] *Id.* at 114.
[41] *Id.*at 41.

medication.  After the protester had an apparent seizure in a CPD vehicle, and while observing the protester lying face down in the vehicle, the CPD officer was captured on video saying  "chick's having a seizure I guess."  The officer notes the protester is apparently breathing and states that nothing else can be done.[42]

b.  A CPD officer is recorded as saying to a passive protester "I will tase you if you move, do you hear me?"[43]

c.  A CPD officer called a protester a "little bitch" after they complained about pain.[44]

d.  A CPD officer was recorded telling other officers that he made a protester cry by telling them they would be raped in jail given their small size.[45]

e.  A CPD officer was recorded hitting a protester three times on the head while the protester was laying face down on the floor.  These strikes included punches to the head and neck area.[46]

xiv.  The OIG Protest Report describes how CPD's operational response to the protests "crippled the accountability processes from the start."[47]  The

---

[42] *Id.* at 51.
[43] *Id.* at 51.
[44] *Id.*
[45] *Id.*
[46] *Id.* at 114.
[47] *Id.* at 9.

accountability process was defeated by CPD's failure to ensure that all officers had functioning body warn cameras and CPD officers' "obscuring their badge numbers and nameplates" during the protests.[48]

186.    In July 2021, the Independent Monitor Team (IMT) responsible for overseeing the City's compliance with the consent decree governing CPD operations issued a 464-page report that addresses the City's and the CPD's "response to protest and unrest under the consent decree."[49]  That report contains the following findings:

    i.  The IMT Protest Report describes hearing "from many community member who expressed new fears, frustration, confusion, pain and anger regarding their experiences with officers during protests."[50]  Protesters describe to the IMT how CPD officers verbally abused them, pushed and shoved them, tackled them to the ground, pulled their hair, struck them with batons, fists, or other objects and sprayed them with pepper spray. Protesters also described enduring physical and mental and emotional injuries as result of CPD's violent, abusive conduct, including head injuries and ongoing emotional trauma.[51]

    ii.  The IMT Protest Report further concluded that CPD and the City did not have the "polices, reporting practices, training, equipment, data analysis, community engagement or inter agency coordination required to respond

---

[48] *Id.* at 10.

[49] *Illinois v. City of Chicago*, 17-CV-6260, 6 (N.D. Ill. 2021) (Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protest and Unrest Under the Consent Decree) (Hereinafter "IMT Protest Report").

[50] *Id.* at 12.

[51] *Id.* at 13.

effectively" to the protests.[52]

iii. The IMT Protest Report documented that "some officers engaged in various levels of misconduct and excessive force."[53] The IMT also reports that because of CPD's officers' failure to wear body cameras and comply with reporting requirements "the actual number of use of force incidents may be unknowable, including how often O.C. spray was used."[54]

iv. The IMT described how CPD officers were "deployed without their equipment" including body worn cameras.[55] "According to CPD, there were at least 5,676 officers who responded to protests and unrest between May 1, 2020, and August 12, 2020, without body-worn cameras. The IMT described how "supervisors instructed [officers] to not have the cameras on the entire time while responding to crowds during 12-hour shifts to preserve battery life."[56]

   a. The IMT found that what body camera footage does exist often depicted CPD officers violating law and policy including the following incidents: The IMT described video footage that reveals "many examples of officers communicating disrespectfully and using force."[57]

   b. In one instance the IMT documents footage depicting CPD

---

[52] *Id.* at 14.
[53] *Id.* at 15.
[54] *Id.* at 18.
[55] *Id.* at 14.
[56] *Id.* at 140
[57] *Id.* at 56.

officers "charging at people as the crowd disperses . . . One officer can be seen pushing and nearly tackling a person who appears to be standing by observing the incident."[58]

c. "Another video depicts officers pushing and shoving people after a commotion breaks out and then throwing and tossing bikes, and another video depicts officers tackling some people amidst a commotion of pushing and shoving between people in the crowd and officers."[59]

d. One video from May 30, 2020 depicts an officer aggressively pushing, tackling, and fighting with people on the ground and then arresting people.[60]  Another video from the same day show officers pushing, showing, and pulling people and using batons to push against protesters. Additional video depicts officers throwing bikes, drawing their batons at crowds that are dispersing, pushing, and shoving.  In one particularly violent incident "one officer tries to restrain a woman on the ground, other officers yell, "Pick her up."  The officer continues to drag the woman a couple of feet before trying to pick her up."[61]

e. The IMT describes camera footage depicting CPD officers

---

[58] *Id.*
[59] *Id.*
[60] *Id.* at 70.
[61] *Id.* at 71.

denying water to a pregnant, Black protester who CPD officers arrested. The officers then mocked the women for her request. The report contrasts the callous disdain the officers exhibited towards this women with the permissive, gentle approach officers used with a white male protester who was allowed to walk away from the same scene merely because he promised officers he would go home.[62]

f.  The IMT Protest Report documents video evidence demonstrating officers swearing at protesters, threatening them, and calling protesters slurs like "pussy ass bitch" and "big ass bitch."[63]

g.  IMT reviewed videos that "also depicted many instances of officers using force, including baton strikes and punches. For example, one video shows an officer jogging into the crowd. He then appears to turn toward someone, then grabs and starts punching the person. In another instance, an officer gets into a tug-of-war with someone over a bike, and then appears to throw the bike at the person. The person gets upset, begins walking towards the officer and stops. Then the officer walks toward the person, further closing the gap between them, and shoves the person.

---

[62] *Id.* at 71.
[63] *Id.* at 71, 77.

There was also footage of an officer swinging his baton like a baseball bat."[64]  The IMT Protest Report also describes CPD officers' indiscriminate use of O.C. spray.[65]

h.  The IMT noted that videos also depicted CPD officers engaging in inherently escalatory behavior.  In "several videos where officers appeared to advance, narrowing the spatial gap between the officers and the crowd, but gave the crowd no prior or subsequent instruction that would justify the officers getting closer (i.e., communicating the need for the crowd to move back).[66]  Additionally, "there were times when officers had their batons in their hands even when the crowd was docile or, in several instances, when officers were not near a crowd at all.  Officers would often walk toward crowds with them."[67]  "[S]ome officers may be more willing to start disrespectful interactions with people in crowds—or worse."[68]

i.  Body worn camera footage also revealed the depth of the animus CPD officers hold against protesters.  According to the IMT's review "in a number of instances, CPD officers made disparaging remarks about community members.  For

---

[64] *Id.* at 95.
[65] *Id.* at 95.
[66] *Id.* at 129.
[67] *Id.* at 130.
[68] *Id.* at 193.

instance, officers said things such as the following: "Somethin' gonna happen tonight. I wanna hit this mother fucker right here. There's more people coming. They think they're something. They all need they ass whooped. It's embarrassing."[69] "In other instances, [CPD officers made] common references to community members as 'animals' and 'savages,' particularly when referencing people who were looting or participating in violence."[70]

## LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – Excessive Force

187. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

188. Count I is alleged against all Defendant Officers.

189. As described in detail above, the Defendant Officers used unreasonable and excessive force, without legal cause, against Plaintiffs and/or failed to intervene to prevent the use of excessive force against Plaintiffs, in violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution.

190. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

---

[69] *Id.* at 194.
[70] *Id.*

191.    The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, extreme mental distress, anguish, and fear as set forth more fully above.

**COUNT II – 42 U.S.C. § 1983**
**Violation of the First Amendment – Freedom of Speech and Assembly, Intimidation and Retaliatory Use of Force**

192.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

193.    Count II is alleged against all Defendant Officers.

194.    As described in detail above, Plaintiffs were participating in lawful, constitutionally protected activity on the public streets of the City of Chicago.

195.    The actions of the Defendant Officers described above violated Plaintiffs' rights to freedom of speech and assembly guaranteed by the First and Fourteenth Amendments to the United States Constitution, in that Plaintiffs were abruptly prevented from further exercising their rights and suffered retaliation for having exercised his rights.

196.    The Defendant Officers retaliated against Plaintiffs for engaging in protected speech by subjecting them to excessive force without legal justification and/or failing to intervene to prevent the use of excessive force.  Plaintiffs' protected speech was the substantial and motivating factor for the Defendant Officers' use of force against them.  The Defendant Officers' actions were intended to make Plaintiffs and other people engaging in constitutionally-protected speech and assembly at the protests wary of continuing to engage in such protected activities in the future and specifically to chill their rights guaranteed under the First Amendment.

197.    At all relevant times, the Defendant Officers were aware that Plaintiffs were engaged in constitutionally-protected speech and assembly when they violated their rights.  The

misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

198.     The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain and suffering, extreme mental distress, anguish, and fear as set forth more fully above.

### COUNT III – 42 U.S.C. § 1983
### Conspiracy to Deprive Plaintiffs of Their Constitutional Rights

199.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

200.     Count III is alleged against all Defendant Officers.

201.     Each of the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

202.     Each of the Defendant Officers took concrete steps to enter into an agreement to unlawfully use force on Plaintiffs knowing they lacked reasonable suspicions and/or probable cause to do so, and for the purpose of violating Plaintiffs' First, Fourth, and Fourteenth Amendment rights.

203.     In furtherance of this conspiracy, each of the Defendant Officers committed specific overt acts, misusing their police powers for the purpose of violating Plaintiffs' rights. They accomplished this goal by using excessive force on all Plaintiffs.

204.     Each individual Defendant Officer is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant Officer.

205.    As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiffs suffered damages, including bodily injury, pain, suffering, mental distress, anguish, and fear as set forth more fully above.

### COUNT IV – 42 U.S.C. § 1983
### Failure to Intervene

206.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

207.    Count IV is alleged against all Defendant Officers and Defendant Superintendent David Brown in his individual capacity.

208.    During the events described above, the Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights under the First, Fourth, and Fourteenth Amendments, even though they had the opportunity and duty to do so.

209.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

210.    As a direct and proximate result of the Defendants' failure to intervene, Plaintiffs suffered damages, including bodily injury, pain and suffering, extreme mental distress, anguish, and fear, as set forth more fully above.

### COUNT V – 42 U.S.C. § 1983
### Unlawful Policy and Practice

211.     Plaintiffs repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

212.    Count V is alleged against Defendants City of Chicago and Superintendent David Brown in his official capacity.

213. The Defendant Officers acted under the color of law, and under the authority of one or more interrelated de facto policies, practices, and/or customs of the Chicago Police Department, to violate Plaintiffs' rights as set for in the preceding claims.

214. The City of Chicago through its Police Department, Police Superintendent, Police Board, Mayor, and City Council has interrelated *de facto* policies, practices, and customs which included, *inter alia*:

    a. Using excessive force against protesters without justification, including but not limited to: beating individuals with batons; beating protesters through punching, kicking, kneeing, and stomping; using chemical agents like pepper spray and tear gas; tackling protesters to the ground; and hitting individuals with bikes.

    b. Using lethal force against protesters, including but not limited to striking protesters on the head and neck with batons.

    c. Retaliating against protesters who record the police and/or speak out against police violence.

    d. Escalating encounters through taunts, slurs, pushes, shoves, and acts that illustrate CPD's animus toward protesters.

    e. Falsely arresting protesters for engaging in protected speech and assembly.

    f. Targeting those the CPD has identified as, or perceives to be, leaders, protest marshals, legal observers, and medics for excessive force and false arrest.

    g. Giving protesters no reasonable opportunity to leave and/or trapping protesters in enclosed areas.

      h.   Using chemical agents like pepper spray and/or tear gas without prior warning.

      i.   Breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, glasses, goggles, and backpacks.

      j.   Failing to intervene to prevent police violence and other forms of misconduct.

      k.   Failing to hold officers accountable who violate protesters' rights.

      l.   Failing to train officers on how to appropriately respond to protesters.

      m.   Maintaining, condoning, and failing to take any steps to end the code of silence in the CPD that allows Chicago police officers to violate protesters and other civilians' rights with impunity.

215.    The interrelated policies, practices, and customs alleged above are or should be well-known within the CPD.

216.    The CPD is aware of the harms suffered by Plaintiffs and other protesters as a result of the interrelated policies, practices, and customs alleged above.

217.    The City has implemented, enforced, encouraged, and sanctioned CPD's policies, practices, and customs alleged above in violation of Plaintiffs' and other protesters' First, Fourth, and Fourteenth Amendment rights.

218.    The City has acted with deliberate indifference to the First, Fourth, and Fourteenth Amendment rights of Plaintiffs.  As a direct and proximate result of the acts and omissions of the City and CPD, the First, Fourth, and Fourteenth Amendment rights of Plaintiffs have been violated.

219.     Defendant Superintendent Brown, in his role as Superintendent of the CPD, was the final policymaker for CPD's response to the protests.

220.     Defendant Superintendent Brown developed and maintained policies, practices, procedures, and customs of Chicago Police officers using excessive force against protesters and falsely arresting protesters, exhibiting deliberate indifference to the constitutional rights of Plaintiffs, including but not limited to those policies, practices, procedures, and customs described above, which caused the violation of Plaintiffs' rights as described herein and the resultant damages suffered.

221.     Defendant Superintendent Brown had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so, in violation of 42 U.S.C. § 1983.

222.     Upon information and belief, Defendant Superintendent Brown was deliberately indifferent to the need for further training, supervision, or discipline related to the use of force against protesters, as reflected by the continued maintenance of the policies, practices, and customs of using excessive force that was carried out by Chicago Police officers under his control.

223.     The actions and omissions of Defendant Superintendent Brown as described herein were done with knowing disregard for the constitutional rights of Plaintiffs.  Defendant Superintendent Brown acted maliciously, willfully, wantonly, and in reckless disregard of Plaintiffs' rights under the Constitution.

224.     The policies, practices, procedures, and customs of the CPD were the direct and proximate cause of the violations of Plaintiffs' constitutional rights and the damages they

suffered, including bodily injury, pain and suffering, extreme mental distress, anguish, and fear as set forth more fully above.

## COUNT VI – Illinois State Law Claim
## Violations of the Illinois Constitution

225. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

226. Count VI is alleged against all Defendant Officers.

227. The actions taken by the Defendant Officers denied Plaintiffs their state constitutional rights to free expression and assembly in a peaceable manner; as provided by the Illinois Constitution, Article I, sections 1, 2, 4, 5, and 6, and were a direct and proximate cause of Plaintiffs' injuries as set forth above.

228. The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' Illinois State Constitutional Rights.

## COUNT VII – Illinois State Law Claim
## Assault and Battery

229. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

230. Count VII is alleged against all Defendant Officers.

231. As described in detail above, the Defendant Officers physically abused Plaintiffs by, inter alia, spraying them with a chemical agent.

232. The actions of the Defendant Officers were affirmative acts and threatened to cause or did cause an unpermitted contact of a harmful and/or offensive nature, to which Plaintiffs did not consent, and thus constitute assault and battery under the laws of the State of Illinois.

233. The actions of the Defendant Officers were committed in a willful and wanton manner.

234.     The Defendant Officers' actions directly and proximately caused injury and damage as set forth above.

## COUNT VIII – Illinois State Law Claim
## Intentional Infliction of Emotional Distress

235.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

236.     Count VIII is alleged against all Defendant Officers.

237.     The conduct and actions of the Defendant Officers set forth above were extreme and outrageous.  The Defendants' actions were rooted in an abuse of power and authority, and were done intentionally, willfully, and wantonly, and/or knowing that there was a high probability that their conduct would cause Plaintiffs severe emotional distress as set forth above.

238.     As a direct and proximate cause of the extreme and outrageous conduct of the Defendant Officers, Plaintiffs were injured and experienced severe emotional distress constituting intentional infliction of emotional distress under Illinois State law.

## COUNT IX – Illinois State Law Claim
## Conspiracy

239.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

240.     Count IX is alleged against all Defendant Officers.

241.     The Defendant Officers together reached an understanding, engaged in and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to violate Plaintiffs' rights guaranteed by the Illinois constitution and to be free from the intentional infliction of severe emotional distress on Plaintiffs.

242.     In furtherance of this conspiracy or conspiracies, the Defendant Officers, together with their un-sued co-conspirators, committed the overt acts set forth above.

243.    The Defendant Officers acted with malice, willfulness, and reckless indifference to Plaintiffs' rights.

244.    Each individual Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant.

245.    The conspiracy or conspiracies were and are continuing in nature.

246.    As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiffs suffered damages, including bodily injury, pain and suffering, extreme mental distress, anguish, and fear as set forth more fully above.

**COUNT X – State Law Claim**
**Respondeat Superior**

247.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

248.    Count X is alleged against Defendant City of Chicago.

249.    In committing the acts alleged in this Complaint, each of the individual Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment.

250.    Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

**COUNT XI – State Law Claim**
**Indemnification**

251.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

252.    Count XI is alleged against Defendant City of Chicago.

253.    In Illinois, pursuant to 735 ILCS 10/9-102, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

254.     The Defendant Officers acted within the scope of their employment in committing the misconduct described herein.  Therefore, Defendant City of Chicago is liable as their employer for any resulting damages or award of attorney's fees.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor against the Defendants in the following manner:

1.     Award Plaintiffs compensatory and punitive damages.

2.     Award Plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

3.     Award Plaintiffs such other and further relief as this Court may deem appropriate and just.

### JURY DEMAND

Plaintiffs demand trial by jury.


Dated: November 7, 2023

                                        Respectfully submitted,

                                        /s/ Ben H. Elson
                                        Ben H. Elson, Joey Mogul
                                        Brad Thomson, Janine Hoft,
                                        Nora Snyder, Hakeem Muhammad
                                        People's Law Office
                                        1180 N. Milwaukee Ave.
                                        Chicago, IL 60642
                                        773-235-0070
                                        ben@peopleslawoffice.com
                                        joeymogul@peopleslawoffice.com
                                        brad@peopleslawoffice.com
                                        janinehoft@peopleslawoffice.com
                                        norasnyder@peopleslawoffice.com
                                        hakeemmuhammad@peopleslawoffice.com

/s/ Jonathan Manes
Jonathan Manes
MacArthur Justice Center
160 E. Grand Ave, 6th Fl.
Chicago, IL 60611
(312) 503-0012
jonathan.manes@macarthurjustice.org

/s/ Vanessa del Valle
Vanessa del Valle
Roderick and Solange MacArthur
Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 606611-3609
312-503-5932
vanessa.delvalle@law.northwestern.edu